**Robert BYE, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 69 Civ. 3440.**

United States District Court, S. D. New York.

June 23, 1971.

Guy Miller Struve, New York City, for petitioner.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, New York City, for United States of America; Elliot G. Sagor, Asst. U. S. Atty., of counsel.

## OPINION

COOPER, District Judge.

Our Circuit, in Bye v. United States, 435 F.2d 177, "first announced"[1] as the controlling rule in this district that a narcotic offender's ineligibility for parole is a consequence of his plea of guilty, and a court's omission to so inform defendant at the time of accepting the plea constitutes a failure to comply with Rule 11, F.R.Crim.P.[2] Accordingly, the Court remanded this litigation[3] for a factual hearing on petitioner's claim that at the time he pleaded guilty he was unaware of his parole ineligibility, and squarely placed upon the Government the burden "of proving that his guilty plea was entered voluntarily with an understanding of the consequences of the plea."[4] 435 F.2d at 181.

On the basis of the papers before us and the evidence adduced at the hearing on December 30, 31, 1970 and January 21, 28, 1971 we are constrained to and do conclude that the Government has been unable to satisfy (albeit by a close margin) this burden of proof.

### Parole Information Prior to Guilty Plea

Arthur Gruder, Bye's counsel at the time of the plea, (Tr. 60)[5] testified at the hearing that he first became aware of a narcotic offender's ineligibility for parole in 1969 when Bye's present counsel contacted him in connection with this proceeding (Tr. 64, 69). Although we view it as remarkable, we are convinced

---

1. United States v. Welton, 2d Cir., 439 F.2d 824 (1971).

2. Rule 11 provides in pertinent part:
   "The court may refuse to accept a plea of guilty, and shall not accept such plea * * * without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea."

3. This court denied petitioner's application on October 10, 1969, Bye v. United States, 309 F.Supp. 202 (S.D.N.Y.), re-

lying on United States v. Caruso, 280 F.Supp. 371 (S.D.N.Y.1967).

4. Subsequent decisions, Welton, supra, and Serrano v. United States, 2d Cir., 1971, 442 F.2d 923, have refused to extend this aspect of Bye retroactively. Of course, any pleading post-dating McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), where the Court did not specifically inform defendant of his ineligibility, requires an automatic vacation of the guilty plea.

5. "Tr." followed by a page number refers to testimony of the hearing transcript.

that Gruder in fact did not know of Bye's ineligibility when petitioner entered his guilty plea, and accordingly could not have advised Bye of this consequence of the plea. Further, Gruder testified that in the course of a conversation with Bye shortly before his guilty plea was recorded, as in "practically every instance" of his representation of a criminal case defendant, he "admonished" Bye to "behave * * *. I told him that he would get credit for good time provided he behaved * * * and there would be a possibility that when he comes up for parole, if he behaves, they will look at him with a little favor." (Tr. 66–7.) We consider Gruder's affidavit of July 14, 1970 (Gov't. Ex. 12) as seriously undermining his credibility as to this purported conversation with Bye;[6] his most recent "recollection" is however a natural expression consistent with the overall "effectiveness of counsel"[7] with which petitioner was provided in 1966.

The only witness able to offer direct evidence that prior to his plea of guilty Bye was informed he would not be eligible for parole was Peter Scrocca, a group supervisor attached to the Bureau of Narcotics and Dangerous Drugs, and Bye's arresting officer. (Tr. 243.) Because of the nature of the crucial issue before us, the exact phraseology of Scrocca's testimony became critical. He testified:

"I can't give you the exact words. I apprised Mr. Bye of his constitutional right, his right to counsel, the right to remain silent. I also advised him that the particular offense for which he's going to be charged would carry a sentence of five to twenty years and that the minimum he would do in this particular case no matter what if convicted would carry a sentence of at least three years and eight months." (Tr. 248.)

We find significant Scrocca's failure, throughout his entire hearing testimony, to assert that he specifically advised Bye of a narcotics offender ineligibility for parole. (Tr. 251.) In fact, neither the express term "parole" nor the general concept of parole appear in his recounting of his statments to Bye at that time. Scrocca did testify that he informed Bye that "no matter what if convicted [he would have to serve] * * * at least 3 years and 8 months." (Tr. 248, 258.) We cannot conclude that this brief statement is equivalent to advising a defendant of the full breadth of the consequence of parole ineligibility.

Additionally, Scrocca testified that it was his ordinary practice to discuss with an apprehended narcotic's dealer that "with substantial cooperation" the Bureau might recommend a tax count charge and "the [resulting] possibility of receiving a suspended sentence and not going to jail at all." (Tr. 264.) Although Scrocca could not recall engaging in a tax count discussion with Bye (Tr. 258), he did acknowledge Bye's apparent "willingness to cooperate" at that time.[8] (Tr. 258.)

We find noteworthy that Scrocca himself was misinformed as to the availability of parole in a tax count violation (Tr. 258–9; Petitioner's Post-Hearing Memorandum, March 18, 1971, p. 6).

6. In this affidavit, Gruder recited that he "had no specific recollection of discussing the possibility of parole with Bye." Although this affidavit was before our Circuit, it noted that "at the hearing * * * Bye may adduce proof of the claimed advice by his attorney to substantiate his claim that he did not know of his ineligibility for parole." 435 F.2d at 179, n. 3.

7. We view Gruder's testimony of January 10, 1967 (Gov't. Ex. 3) as relating only to his representations to Bye of a prospective single count sentence and the absence of any reference in that testimony to his alleged statements concerning parole as inconsequential.

8. Scrocca also acknowledged that with such a defendant it would be "likely to say that there would be something in it for him."

Although Bye's codefendant Cordero was aware that availability of parole depended upon the particular statutory provision (Tr. 235), he likewise shared misconceptions as to the effects of a tax count conviction on the potential sentence.

Further, petitioner alleged that both his faculty to comprehend and remember what Scrocca had imparted was substantially impaired by drugs injected into him shortly before his arrest. (Tr. 419, 421.) Although Scrocca could not recall whether Bye evidenced any symptoms of narcotics addiction (Tr. 261), Bye's allegation that he was "high" at the time of his arrest, receives some support from documentary evidence (Petitioner's Ex. B) which Scrocca interpreted as "reflecting the fact that * * * Bye, was, in fact, an addict at the time of his arrest." (Tr. 262.)

On the basis of this record as viewed in the context of Gruder's testimony, we cannot conclude that Scrocca brought home to Bye the parole ineligibility feature of his prospective sentence.

### Presumption Evidence

The Government sought to establish the presumption that a narcotics offender, as was Bye, involved in the drug traffic would necessarily be aware of the essence of criminal statutes forbidding such activities, and most particularly with punishment therefor as provided by law. Government's Memorandum of Law, March 5, 1971, pp. 10–15. Petitioner repeatedly sought to exclude this form of evidence at the hearing (e. g. Tr. 48–49, 110) and continued to press the objection to the appropriateness of this form of proof in its post hearing argument. Petitioner's Memorandum, pp. 4–5.

*a In favor*

The legitimacy of the inference the Government seeks to rely upon was expressly recognized by our Circuit in *Welton, supra*, which found in the circumstances of Welton's apprehension, "an unusually large amount [of heroin] * * * justifies the inference that Welton was a large-scale smuggler who would have known the consequences of a federal conviction." *Welton*, at 827 of 439 F.2d. Although Welton's ten (10) pounds of heroin far "outweighs" Bye's thirty (30) grams (Tr. 245), petitioner's lengthy involvement in trafficking of narcotics (Tr. 229) justifies, on the facts before us, the operation of the presumption.

However, as we repeatedly emphasized at the hearing, and based upon the evidence adduced there, the weight accorded this form of evidene, in light of the particular factual surrounding of Bye's plea of guilty, cannot be substantial. (Tr. 135–136, 158).

The hearing evidence as to the applicability of the presumption to Bye's state of knowledge was equivocal at best. Witness Hahs, administrative assistant at the Atlanta penitentiary (to which petitioner was sent following sentence), although unable to recall the form of expression used by recently arrived inmates there, testified that "they inferred that they realized they were not eligible for parole." (Tr. 126); that he had no "way of knowing whether they realized it before [he] told them" (Tr. 127–128); that the inmates whose comments formed the basis of his opinion had been exposed to counsel, the court, and preliminary incarceration—all sources of information—prior to arriving at Atlanta. (Tr. 128.)

Likewise, the "feeling" (Tr. 154) expressed by witness Kennedy, a federal parole officer and group therapist at Atlanta (Tr. 149), is unimpressive by reason of these same uncertainties. (Tr. 157–158, 166–169).

Witness Shade, associate warden at West Street detention centre in New York City, and previously a prison classification officer (Tr. 170–171), testified that of some 500 conversations with narcotic offenders, "I have never had a man

to tell me that he was not aware he was ineligible for parole, whether I ask him or he asked me." (Tr. 181.) However, on cross-examination, Shade put it this way: "I knew that they knew that they weren't eligible at the point that I saw them, I said, 'You are not eligible for parole, so your release will be here, so let's talk about what you are going to do in prison for so many years.' " (Tr. 193.) Accordingly, his opinion was not bottomed on affirmative acknowledgements by prisoners of parole ineligibility, but simply on a "lack of response" to his definitive statement.[9] (Tr. 196.)

Witness Sydor, the probation officer who conducted the post plea presentence interview with petitioner (Tr. 207), could not recollect "discussing this topic of parole ineligibility" with Bye (Tr. 221); "at no time [in the course of similar interviews] was there any doubt or question raised about no knowledge of ineligibility." (Tr. 217.)

While we found each of the aforementioned witnesses fully credible, on the basis of the limited scope of their surveys none was able to offer a clear-cut, unambiguous, expression capable of conveying one interpretation—that the prisoner had definite knowledge of parole eligibility prior to his plea of guilty. This time element we view as critical, for as our Circuit pointed out in *Welton,* "every minimally competent attorney practicing criminal law surely has known this, and it has been his professional duty so to inform his client in advising him to plead guilty." *Welton* at 826. Only in the most extraordinary situation would any one of the witnesses mentioned be the first to confront the narcotic offender with his parole ineligibility.

Co-defendant Cordero testified that the "street knowledge among users of heroin and sellers of heroin on the street as to the consequences of getting caught by federal authorities" was "[u]sually its [sic] five years, they figure." (Tr. 232.) In response to our direct inquiry as to the "common knowledge with regard to parole," Cordero stated "I wouldn't know." Likewise, witness Arana, a long-time steady customer of Bye's (Tr. 236–237), testified that one would quickly learn the consequences of an arrest by federal authorities (Tr. 240): "the government is dangerous because on one bag you could get five years where the city might give you a suspended sentence. * * *" (Tr. 242.) Both witnesses testified about the widespread familiarity with the unusual length of a federal sentence, but neither referred to the knowledge of parole ineligibility.[10]

*b In opposition*

Defense witnesses Lynn Hageman, executive director of Exodus House (Tr. 280) and practicing defense attorneys Kreiger (Tr. 293) and Chapman (Tr. 309), testified, in substance, that the overwhelming majority of those involved in the drug trade and named as defendants are not familiar with the ineligibility of parole feature of a federal narcotics conviction. (Tr. 284–287).[11]

Witness Kreiger testified that his "clients consistently are surprised" when he informs them of parole ineligibility. (Tr. 295.) Witness Chapman concluded that only "the small minority of the hardened offenders know that under statute there is no possibility of parole" and the others "just can't understand it. They think they are entitled to a third off and why shouldn't they get it." (Tr. 311.) Whether their reactions were accurate reflections of the prisoners' actual knowl-

---

9. Shade did testify that on certain occasions the inmate would "volunteer" his familiarity with parole ineligibility.

10. Neither apparently ever spoke with Bye as to the consequences of a "federal bust." (Tr. 229, 238.)

11. In one respect we found their testimony more telling, for their opinions focused on the state of knowledge at a period of time prior to a plea of guilty.

edge (they may have simply feigned ignorance to gain a sympathetic response), were not inquired into and remain a matter of conjecture.

In any event, as we consistently noted at the hearing and at the outset of this portion of our opinion, this evidence sheds little light on determining when Bye first became aware of parole ineligibility.

### Petitioner's Account

Petitioner sought to buoy his contention that he was unaware of his parole ineligibility at the date of his plea (November 29, 1966) by affirmatively asserting that he first learned of his parole status in the course of a conversation with another inmate in the dining room of the Atlanta penitentiary at the end of February or the beginning of March, 1967. (Tr. 410–412; Petitioner's Memorandum, pp. 11–12.) We reject Bye's testimony as entirely unworthy of belief.

Subsequent to pleading guilty, a confessed narcotics trafficker meets with a probation officer in the course of preparation of the presentence report who "on many times, many occasions, not all" would discuss parole ineligibility (Tr. 214). At West Street, the inmate would as a matter of course speak with a prisoner classification officer in determining at "what institution [he] will serve [his] sentence," and discuss parole "in every conversation." [12] (Tr. 437–438, 171). Further, upon arrival at the Atlanta penitentiary every inmate undergoes a series of introductory interviews in the course of which parole is necessarily discussed [13] in order to complete penitentiary records and the prisoner's "time card" (bible (Tr. 34)). (Tr. 8, 268, 441; Gov't Ex. 10.) Within days after arrival, Atlanta regulations (in effect in 1967) provided that the inmate participate in an interview with a parole officer (Tr. 142) which would focus on "[t]he sentence, the length of it * * * his parole plans." [14] (Tr. 147–148, 440.)

Additionally, immediately after pleading guilty, Bye spent a week at West Street yet incredibly "didn't speak to anybody" (Tr. 500) as to the length of his sentence, or with his "close" friend Cordero as to their disparate treatment by the Court. (Tr. 501.)

Webster Bivens, whose testimony corroborated this version of petitioner's discovery of parole ineligibility, we found to be Bye's collaborator; he too took

12. Witness Shade testified that the classification officer Bye conferred with "is very ill," but that he was familiar "with the procedure in January 1967." (Tr. 172.) Although in cross-examination, Shade admitted that he could not testify from personal knowledge what procedure that classification officer employed, (Tr. 187), his testimony that "it has always been a fundamental obligation or duty of a classification officer to discuss with the prisoner the matter of parole" (Tr. 174) convinces us that it is very likely that Bye was informed of parole ineligibility at that time.

13. Witness Hahs was not clear in detailing the procedure the recently arrived inmate follows; it is apparent that the prisoner's parole status would be discussed with him. (Tr. 105–106.)

14. Among other aspects of petitioner's testimony we found unconvincing and

seriously undermining his believability was his testimony that "he didn't think" he ever had conversations with anyone concerning the "consequences of being arrested by federal authorities." (Tr. 459–460), and his denial of ever having seen witness Arana prior to appearing at the hearing or Scrocca before his arrest. We need not rule on the admissibility of Government Exhibit 15, which constituted a prior inconsistent statement as to Bye's recognition of Scrocca at the time of his arrest. We simply note that one basis upon which petitioner opposes the statement, its alleged coercive extraction, would exclude it from being considered even for this limited purpose. (Tr. 453.) This item of evidence does not materially affect our determination of petitioner's credibility; simply stated, even if admitted, it is purely cumulative.

great liberties with truth. Bivens would have us believe he too first learned of his parole ineligibility when he received his "time card" at Atlanta. (Tr. 331–335).[15] Nevertheless, Bivens acknowledged an awareness that his minimum term of incarceration on a fifteen (15) year sentence would be approximately eight (8) years. He maintained he was able to properly compute this time, allegedly despite not being informed of parole ineligibility, because he "had no intentions [sic] on going out on parole. I was going to finish my time but I knew I was going to make good time." (Tr. 355.) Although he has unsuccessfully sought release in a variety of post conviction motions (Tr. 382–383) he steadfastly insisted that if offered parole he would decline. (Tr. 356.)

In sum, we reject petitioner's contention that he first discovered the fact of his parole ineligibility from Bivens.

### Disposition

■ Although we find completely unacceptable petitioner's testimony of belated enlightenment, on the basis of the evidence before us we cannot fix with necessary certainty the true date when Bye first realized that the potential maximum consequence of a narcotics conviction pursuant to 21 U.S.C. §§ 173, 174 was a twenty (20) year term of imprisonment without the availability of parole. Nor can we conclude, as the Government alternatively suggests, that Bye's application may still be denied inasmuch as his alleged ignorance would not have affected his decision to plead guilty. Bye testified that if he had been fully informed of the consequences

of his plea, he would not have entered a guilty plea. (Tr. 410.) Although the testimony reveals weighty evidence of petitioner's guilt, it is insufficient for us to exclude the possibility that petitioner would have chosen to take his chances at trial.[16] (Tr. 276–277, 460.)

■ Thus we are presented with inference heaped on heavy inference, the totality of which however barely misses the mark. Accordingly, we are compelled to grant petitioner's application pursuant to 28 U.S.C. § 2255 to vacate his judgment of conviction by plea, for the available evidence as to the state of Bye's knowledge on November 29, 1966 is insufficient to support the Government's burden of proof. Bye's release from incarceration, on the basis of his petition, is, in part, the price this Court and society is called upon to pay if we are to make secure the imperative obligation imposed on the Court to inform the narcotic offender of his ineligibility for parole upon conviction for violation of 21 U.S.C. §§ 173, 174.

We appreciate the splendid efforts of counsel on both sides who demonstrated once again that there is no substitute for thorough preparation on the law and on the facts. The prosecutor was fair but firm in his approach to his undertaking; assigned counsel proved a match (we see it often) for any attorney who might have represented defendant had he been in a position to afford and choose from among the best.

The Government shall unconditionally release the petitioner from confinement unless within sixty (60) days from the date hereof the respondent shall proceed to retry him. If respondent elects to

---

15. As we extensively noted above, we found credible the testimony of government witnesses relating to the procedure a defendant would undergo subsequent to plea or conviction, and accordingly dismiss this contention.

16. We cannot preclude petitioner from raising this contention on the ground that

he waived an opportunity to move to withdraw his plea on January 10, 1967. Whether or not Bye knew of his ineligibility on that date, he was not aware that it constituted a basis for relief and it is conceivable that his attorney advised against pressing such an application. (Tr. 468–469, Gov't Ex. 2, p. 6.)

 

appeal from this disposition, this order shall be stayed upon the filing of a notice of appeal, pending the mandate of the Court of Appeals for the Second Circuit.

So ordered.

